UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.                                                 Criminal Case No. 12-20843

Donald Steven Reynolds,             Sean F. Cox
                                                 United States District Court Judge

    Defendant.
_____/

## OPINION
## REGARDING RESTITUTION TO VICTIMS

Following a jury trial, Defendant Donald Steven Reynolds ("Reynolds") was convicted of receiving, distributing, and possessing child pornography. This Court imposed sentence on March 28, 2014. At the request of the parties, this Court agreed to hold a separate hearing regarding restitution, and to do so after the United States Supreme Court issued its decision in *Paroline v. United States.* (*See* Docket Entry No. 160). That decision has since been issued and the parties filed new briefs setting forth their respective positions as to restitution requests by two identified victims, "Cindy" and "Vicky." The Court set a restitution hearing for August 8, 2014, but at that time both parties relied on their briefs and the exhibits that had been submitted. As explained below, based upon guidance from the *Paroline* decision and after consideration of several factors, this Court shall order Reynolds to pay restitution to Cindy in the amount of $11,000, and to Vicky in the amount of $15,500, and the judgment shall be amended to reflect those amounts.

1

**BACKGROUND**

Reynolds was charged with three child pornography counts in this matter. The First Superceding Indictment, filed on March 21, 2013, charged Reynolds with the following three counts: 1) "18 U.S.C. § 2252A(a)(2) – Receipt of child pornography" (Count I); "18 U.S.C. § 2252A(a)(2) – Distribution of child pornography" (Count Two); and "18 U.S.C. § 2252A(a)(5)(B) – Possession of child pornography" (Count Three). (First Superseding Indictment, Docket Entry No. 27).

A jury trial commenced on June 21, 2013.

At trial, the witnesses who testified included F.B.I. Special Agent Ryan Blanton ("Blanton") and F.B.I. Computer Forensic Examiner Walker Sharp ("Sharp").

Blanton was the case agent that began and led the investigation. Blanton testified that while he was working in an undercover capacity on April 7, 2011. He began with an on-line undercover session over a peer-to-peer network. That is, he directly connected to a computer, saw the files that were being shared by that computer, noted those files he believed were indicative of child pornography by virtue of their title, and downloaded complete image files from the computer. Those images were presented to the jury as the Government's Exhibits 2 and 3.[1]

Using the computer's IP address, Blanton determined that the computer he had downloaded the images from was located in Reynolds's home in Canton, Michigan. A federal search warrant was obtained and Reynolds's home was searched on May 26, 2011. During the

---

[1] Reynolds agreed, at trial, that the images contained in those exhibits are child pornography.

execution of the search warrant, Reynolds's desktop computer was seized.

Reynolds told Blanton on the date of the search that he lived in his home with his adult children, Arica Reynolds and Andrew Reynolds, and that Arica's boyfriend Mike Cook occasionally stayed at his home too. Reynolds told Blanton that he used his desktop computer and that Arica Reynolds, Andrew Reynolds, and Mike Cook also had access to it. When asked about peer-to-peer software on the computer, Reynolds said that he believed Frostwire was installed on it.

Sharp performed a forensic review of Reynolds's computer. That forensic review recovered more than 8,000 images of child pornography. Those images recovered from Reynolds's computer were admitted at trial as the Government's Exhibit 10.

A small subset of those 8,000 images of child pornography was admitted as the Government's Exhibit 13. That subset includes images of two identifiable victims, previously-identified child pornography victims known as "Vicky" and "Cindy."

Sharp testified that all of the images were recovered from Reynolds's computer. He also testified that all of the child pornography images recovered from Reynolds's computer were downloaded through a peer-to-peer filing sharing program called Frostwire. Sharp testified that the computer did not contain any images of adult pornography that had been downloaded via Frostwire.

Sharp testified that none of the images of child pornography on the computer were downloaded via an internet browser. He testified that there were images of adult pornography in the Internet Explorer web history of the computer.

At trial, Reynolds's theory of defense was that he did not download the child

pornography that was found on his computer and that it must have been downloaded by other persons who also used it, including: 1) his son Andrew Reynolds; 2) his daughter, Arica Reynolds; and 3) Arica's boyfriend, Mike Cook.

In order to establish that it was Reynolds who downloaded the child pornography on the computer and not others, the Government focused on several specific dates and times when child pornography was downloaded onto the computer and then presented evidence to show that Andrew Reynolds, Arica Reynolds, and Mike Cook were not at the home at those dates and times but that Reynolds was home.

On July 3, 2013, the jury returned a guilty verdict as to all three counts. Thus, the jury found Reynolds guilty of possessing, receiving, and distributing child pornography.

**Objection Regarding Restitution**

The original Presentence Investigation Report ("PSR") was prepared on August 12, 2013, and revised on September 9, 2013. It accurately noted that, before he withdrew, Mr. Freeman filed an objection to restitution. (*See* Addendum to PSR at A-1). Reynolds objects to any award of restitution unless the Government can satisfy its burden pursuant to 18 U.S.C. § 2259 and applicable case law.

The PSR, and the revised PSRs, all state the following as to restitution that should be awarded to victims:

<u>**Restitution**</u>

73.   **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $604,455.30 shall be ordered in this case. Restitution, as set forth below, is due and owing to the following victims:

<u>Victim Name</u>                               <u>Amount of Loss</u>

4

| | |
|---|---|
| Cusack, Gilfillan & O'Day, LLC for "Cindy" 415 Hamilton Boulevard Peoria, Illinois 61602 | $8,000.00 |
| Carol L. Hepburn, P.S. for "Vicky" 2722 Eastlake Avenue East Suite Seattle, Washington 98102 | $596,455.30 |

74.     Guideline Provisions: Restitution shall be ordered.  USSG §5E1.1.

(Revised Addendum and Revisions to PSR at 15-16).

**This Court Imposed Sentence On March 28, 2014, But Agreed To Hold A Separate Restitution Hearing, Following The Supreme Court's Decision in *Paroline*.**

This Court imposed sentence on March 28, 2014.  At the request of the parties, however, this Court agreed to hold a separate hearing regarding restitution and to thereafter amend the judgment as needed.  This Court was scheduled to hold the restitution hearing on Friday, April 18, 2014.  At the request of the parties, however, this Court agreed that it would hold the restitution hearing after the United States Supreme Court's decision in *Paroline v. United States*. (*See* Docket Entry No. 160).

On April 23, 2014, the Supreme Court issued *Paroline v. United States*, __ U.S. __, 134 S.Ct. 1710 (2014).  Thereafter, both parties filed new briefs setting forth their respective positions, as ordered by this Court.

The Government now seeks a restitution award of $15,000 for Cindy and $10,000 for Vicky.  Reynolds objects and asserts that any award of over $1,000 cannot be justified.

This Court scheduled a restitution hearing for August 8, 2014.  Both parties appeared for the hearing and advised the Court that they would not be presenting any witnesses at the hearing

5

and that they relied upon their briefs[2] and exhibits that had been submitted.

## ANALYSIS

**I.    Reynolds's Objections To PSR Regarding Restitution**

At the March 28, 2014 sentencing, this Court did not address Reynolds's objections to restitution, other than to note that, at the parties' request, the Court would hold a separate restitution hearing.  This Court shall therefore begin by addressing Reynolds's objection to restitution.  Reynolds's objection is simply that any award of restitution would be improper unless the Government meets its burden as to establishing an appropriate restitution award under 18 U.S.C. § 2259 and the governing case law.  The Court shall therefore move on to determining the appropriate amount of restitution, if any, under the governing law.

**II.    The Court's Determination Regarding Restitution**

"The Mandatory Restitution for Sexual Exploitation of Children Act, 18 U.S.C. § 2250, was enacted for the purpose of compensating the victims of offenses involving the sexual exploitation of children." *United States v. Evers,* 669 F.3d 645, 657 (6th Cir. 2012).  The Act provides that "[n]otwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution for any offense under this chapter."  18 U.S.C. § 2259(a).  The order of restitution "shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses as determined by the Court" which includes any costs incurred by the victim for: 1) medical services related to physical, psychiatric, or psychological care; 2) physical and occupational

---

[2]At the hearing, Reynolds expressed concern that his mother would somehow be burdened with paying restitution ordered in this case.  Reynolds's mother has no obligation to pay any restitution award in this case.

therapy or rehabilitation; 3) necessary transportation, temporary housing, and childcare expenses; 4) lost income; 5) attorneys' fees, as well as other costs incurred; and 6) any other loss suffered by the victim as a proximate result of the offense. 18 U.S.C. § 2259(b)(3).

Under the Act, restitution is mandatory and the Court may not decline to issue an order because of either the inability of the Defendant to pay or the fact that the victim has, or is entitled to, receive compensation for his or her injuries from insurance proceeds or another source. 18 U.S.C. § 2259(b)(4). Thus, this Court must award restitution even if Reynolds has no assets or ability to pay a restitution award.

    **A.**    **Proximate Cause**

On April 23, 2014, the Supreme Court issued *Paroline v. United States*, __ U.S. __, 134 S.Ct. 1710 (2014). The Supreme Court agreed with the majority of circuits that restitution is proper under the Act "only to the extent the defendant's offense proximately caused a victim's losses." *Paroline*, 132 S.Ct. at 1722.

The Court finds that proximate cause requirement is met here, for the same reasons it was met in *Paroline*. For victims such as Cindy and Vicky, "the cause of [their] general losses is the trade in [their] images." *Id.* at 1726. "While it is not possible to identify a discrete, readily definable incremental loss" that Reynolds caused to each of these two victims, "it is indisputable that [Reynolds] was a part of the overall phenomenon that caused [their] general losses." *Id.* This is because the "unlawful conduct of everyone who reproduces, distributes, or possesses the images of" Cindy and Vicky's abuse – including Reynolds – "plays a part in sustaining and aggravating" the tragedy. *Id.* One of the reasons why restitution is mandatory for crimes like this "is to impress upon offenders that their conduct produces concrete and devastating harms for

real, identifiable victims" like Cindy and Vicky.

> **B.      Proper Amount Of Restitution**

This Court must then determine the proper amount of restitution to be paid by Reynolds. "[W]here it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying §2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Id*. at 1727.   The Supreme Court explained that the amount of restitution "would not be severe in a case like this, given the nature of the causal connection between the conduct" of Reynolds as a possessor of images of Cindy and Vicky and "the entirety of their losses from the trade in their images, which are the product of the acts" of at least hundreds of offenders.  *Paroline*, 132 S.Ct.at 1727. But, at the same time, it should not be a "token or nominal amount" either.  *Id*.

The *Paroline* Court held that "[t]here are a variety of factors district courts might consider in determining a proper amount of restitution."  *Id*. at 1728.  "[D]istrict courts might, *as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images*" and "then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses," which include: 1) "the number of past criminal defendants found to have contributed to the victim's general losses;" 2) "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses;" 3) "any available and

reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted);" 4) "whether the defendant reproduced or distributed images of the victim;" 5) "whether the defendant had any connection to the initial production of the images;" 6) "how many images of the victim the defendant possessed;" and 7) "other facts relevant to the defendant's relative causal role." *Id*. at 1728 (emphasis added).

The Government bears the burden of demonstrating the amount of loss sustained by a victim as a result of the offense. *Paroline*, 134 S.Ct. at 1719.

In his Brief Regarding Restitution (Docket Entry No. 164), Reynolds asserts that "given that the *Paroline* Court continuously used t[he] term 'viewing' (as opposed to possessing) illegal images, the Court appears to suggest that a victim has to *prove* that the defendant actually *viewed* the images depicting the victim." (*Id*. at 2) (emphasis in original).

The Court rejects that argument. *Paroline* says no such thing. Indeed, the Court need not look further than the opening line of the *Paroline* opinion to reject this argument:

> This case presents the question of how to determine the amount of restitution a *possessor* of child pornography must pay to the victim whose childhood abuse appears in the *pornographic materials possessed.*

*Paroline*, *supra*, at 1710 (emphasis added).

This Court shall look to the directives in *Paroline* in determining the proper amount of restitution to be paid by Reynolds to Cindy and Vicky.

### 1. As A Starting Point, What Is The Amount Of Cindy And Vicky's "Losses Caused By The Continuing Traffic In Their Images?"

The majority opinion in *Paroline* suggests that district courts, "as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images" and "then set an award of restitution in consideration of factors that bear on the relative

causal significance of the defendant's conduct in producing those losses." *Paroline*, 134 S.Ct. at

So what is the amount of Cindy and Vicky's "losses caused by the continuing traffic" in their images?

The victim in *Paroline*, "Amy," was eight or nine years old when she was sexually abused by a relative in order to produce child pornography. *Paroline*, 134 S.Ct. at 1717. The abusive relative was prosecuted and Amy received therapy beginning in 1998. By the end of 1999, Amy's therapist noted that she was "back to normal" and that "her involvement in dance and other age-appropriate activities, and the support of her family, justified an optimistic assessment." *Id*. Later in her teenage years, however, Amy learned that images of her abuse were being trafficked on the internet and were available nationwide. "The knowledge that her images were circulated far and wide renewed the victim's trauma and made it difficult for her to recover from her abuse." *Id*. Upon remand, the district court could presumably determine the amount of losses that were caused by the continuing traffic in her images – as opposed to losses that occurred from the initial abuse. But that only seems possible in the rather unique situation presented in *Paroline* where there is some kind of demarcation between the losses from the initial abuse and the losses from continued trafficking.

Thus, Defendant's assertion that Reynolds should not be required to pay for losses that Cindy or Vicky incurred prior to his offense has some teeth. For example, Cindy's request for restitution indicates she has incurred $43,758.63 in "past counseling and other medical expenses." (Ex. G to Sealed Exhibits filed by the Government). Reynolds should not be ordered to pay restitution for medical care that Cindy received several years before Reynolds ever possessed her images because Reynolds only proximately caused losses caused by the continuing

10

traffic in her images.

The Government's brief does not address how it can establish *Paroline's* suggested "starting point" amount of the losses Cindy or Vicky incurred due to continuing traffic in their images. Instead, the Government uses the total amount of losses incurred by both Cindy and Vicky as the starting point. (Govt.'s Br. at 7). This is not due to a lack of effort by the Government. Rather, the Court believes it is a reflection of practical problems inherent in this suggested approach. That is, it is simply not possible for the Government to show, "as a starting point," the amount of losses caused by the "continuing trafficking" in Cindy and Vicky's images. This theoretical starting point will simply not exist in many cases.

### 2. Consideration Of Other Factors In *Paroline*

Because the suggested "starting point" does not logically exist in this case, *Paroline* is of limited use to this Court. But this Court may still consider the other factors discussed in *Paroline* and shall do so.

#### a. Number of Past Criminal Defendants Found To Have Contributed To Victim's General Losses

The Government's Brief notes that Cindy has received 96 restitution orders while Vicky has received far more, 461 restitution orders. Thus, the Government recommends that Cindy's award be adjusted upwards and this Court agrees with that proposition.

#### b. "Reasonable Predictions" And "Reliable Estimates"

The next two factors suggested in *Paroline* are that the Court consider: "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses" and "any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or

convicted)."

The Government has not provided evidence regarding these factors, likely because it simply does not have such information. Frankly, these two suggested factors strike this Court as incredibly speculative – this Court questions how you could ever have reasonable or reliable estimates of the above. These factors therefore do not impact the restitution awards in this case.

### c. Whether Reynolds Reproduced Or Distributed Images Of These Victims

The next factor mentioned in *Paroline* is "whether the defendant reproduced or distributed images of the victim." The Government's brief stresses that, in addition to possession, Reynolds was convicted of distributing child pornography. But the Government's brief also acknowledges that "there is no specific evidence that Defendant distributed Cindy and Vicky's images." (Govt.'s Br. at 8). Accordingly, this Court will not increase the restitution awards based on this factor.

### d. Whether Reynolds Had Any Connection To Initial Production Of The Images

Here, it is undisputed that there is no evidence to indicate that Reynolds had any connection to the initial production of the images of either Cindy or Vicky. Accordingly, this Court will not increase the restitution awards based on this factor.

### e. Number Of Images Of Victims That Reynolds Possessed

The Government's Brief states that Reynolds possessed sixteen (16) images of Cindy and nineteen (19) images of Vicky. Reynolds has not disputed those numbers. The Court concludes it is appropriate to increase the restitution awards based on this factor.

### f. Other Facts Relevant To Reynolds's Relative Causal Role

12

The *Paroline* decision also leaves this Court free to consider other facts relevant to the defendant's causal role.

This Court concludes that it is appropriate to consider the nature of the images of the victims that Reynolds possessed in determining appropriate restitution awards because the victims will suffer more severe trauma from the continued trafficking of extremely graphic/sadistic images than they would from the trafficking of other images.

The Government's Trial Exhibit 13 includes images of Cindy and Vicky, that Reynolds possessed, that portray sadistic conduct. The continued losses of Vicky and Cindy were reasonably foreseeable to Reynolds when he decided to seek out and download graphic images depicting their abuse. Every adult who seeks out and views images of young girls being raped and/or sodomized should reasonably foresee that he is inflicting great harm upon those victims. *United States v. Gamble*, 709 F.3d 551, 557 (6th Cir. 2013); *United States v. Bistline*, 665 F.3d 758, 766 (6th Cir. 2012). The Court concludes it is appropriate to increase the restitution awards based upon this factor.

### 3. Restitution Awards

Given the above, the Court finds that a baseline restitution award of $1,000 to each of the two identified victims is "neither severe nor nominal."

The Court also finds that Cindy's award should be adjusted upward to account for the fact that she has received fewer restitution awards to date. Thus, the Court will increase Cindy's baseline award by $2,000.

This Court also finds it appropriate to increase the restitution awards to both Cindy and Vicky because of: 1) the number of images of the victims that Reynolds possessed of them (16

13

images of Cindy and 19 images of Vicky); and 2) the very graphic and sadistic nature of the images. The Court shall increase the award to Cindy by $8,000 and shall increase the award to Vicky by $14,500.

Accordingly, due to all of these considerations, the Court increases Cindy's restitution award to a total award of $11,000 and increases Vicky's restitution award to a total award of $15,500.

## CONCLUSION

For the reasons set forth above, the Court shall order Reynolds to pay restitution to Cindy in the amount of $11,000, shall order Reynolds to pay restitution to Vicky in the amount of $15,500, and shall amend the judgment to reflect those amounts.

                                          S/Sean F. Cox
                                          Sean F. Cox
                                          United States District Judge

Dated: August 22, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 22, 2014, by electronic and/or ordinary mail.

                                          S/Jennifer McCoy
                                          Case Manager